Appellant, Michael Edward St. John, was indicted by the Etowah County Grand Jury for unlawful breaking and entering of a vehicle, in violation of § 13A-8-11 (b), Code of Alabama 1975. Appellant was arraigned on September 21, 1984, and pleaded not guilty. On October 29, 1984, a jury found appellant guilty as charged, and he was subsequently sentenced to a term of twenty-five years in the penitentiary, upon application of the Habitual Felony Offender Act. This appeal followed. *Page 659 
Randy L. Gilliland testified that he had placed a handgun in his truck while on a fishing trip. After the trip concluded, he left the handgun in his truck and noticed this fact the night he returned to work. Mr. Gilliland placed the gun under his truck seat. He discovered that it was missing, on Friday, October 21, 1983. Later, Gilliland observed that his vent window had been "bent back" out of shape and was "sucking air." Gilliland deduced that this had been the method used to gain entry into his truck to obtain the handgun. Gilliland stated that his truck remained locked at all times when he was not operating the vehicle.
Appellant had inquired about purchasing the handgun from Gilliland, and had offered to pay him $150.00. The handgun, according to Gilliland, was worth much more than that amount, and he refused to sell it. Furthermore, Gilliland stated he did not want or desire to sell the handgun, nor had he ever solicited anyone to purchase the handgun. Based on appellant's expressed interest in buying the pistol, Gilliland suspected appellant of taking it from the truck. Appellant knew this pistol was in the truck.
On Sunday, October 23, 1983, Gilliland accompanied appellant, in appellant's car, to a convenience store and en route Gilliland told appellant the gun was missing. Appellant acted surprised. Gilliland then confronted appellant with his belief that appellant possessed the pistol and requested that appellant open the glove compartment. Appellant refused. Gilliland refused to get out of the car until appellant opened the glove compartment. Appellant offered to open the trunk and offered to take Gilliland to the Sheriff's Office so Gilliland could press charges if he really believed appellant had the pistol. At one point appellant pulled a "hammer handle" from under the seat, but Gilliland took it away from him. Appellant returned to the parking lot of their place of employment, stating that he had "a lot of pot" in his car and wanted to hide it before they went to the Sheriff's Office. Appellant then agreed to show Gilliland the contents of the glove compartment. Appellant went to the passenger side of the car and told Gilliland to move over. Appellant opened the glove compartment and grabbed the pistol, which was in a holster Gilliland recognized as one he purchased for his missing pistol. When appellant obtained the pistol he "rolled out" the passenger side door and Gilliland did the same from the driver's side. Appellant then took the gun from the holster and approached Gilliland, saying, "I'll blow your brains out." Gilliland fled in terror. Appellant got back in the car and left. Gilliland went into the building and called the police. Gilliland next saw the pistol when he obtained it from the Gadsden Police Department.
The State's next witness was James L. Cates of the DeKalb County, Georgia, Police Department. Cates responded to a call on October 23, 1983, at the Doraville Plaza Inn. Appellant matched the description Cates had been given, so Cates approached appellant for questioning. Appellant was eventually searched and a gun was found in a toiletry bag within appellant's reach. Appellant was arrested for carrying a concealed weapon. The pistol was returned to the Gadsden Police Department, where Gilliland identified it as belonging to him and as last seen by him in appellant's possession.
Appellant testified in his own behalf. He testified that he had purchased the handgun from Gilliland between October 16 and 21, 1983. According to appellant, he had paid Gilliland seventy-five dollars down and was to pay the remaining seventy-five dollars on the next payday. When payday arrived, appellant said he was unable to pay the balance because he was having financial problems, and drug problems, which took all his money. Appellant said that on October 23, 1983, Gilliland accompanied appellant to the store and told appellant that he would have to have the gun if appellant could not pay for it. Appellant agreed, but only if Gilliland returned the money first. Gilliland wanted the gun first. Appellant refused. Appellant said he offered to take Gilliland to the sheriff's *Page 660 
office so a warrant could be obtained, although appellant later testified that he knew he would be in a great deal of trouble if the Sheriff knew he was in possession of a handgun, due to his many prior felonies. Appellant stated that they returned to the parking lot and Gilliland threatened to tell the police that he suspected appellant of breaking into his truck and taking the pistol. Gilliland then took the "hammer handle" and threatened appellant. Appellant then agreed to open the glove compartment and, when he did, Gilliland grabbed for the gun. Appellant "pulled it away from" Gilliland and the holster fell off. Appellant had the gun pointed at the ground and Gilliland said, "Don't shoot me." Appellant said, "I'm not. Go tell the boss I'm going home."
Appellant stated that he knew he was in trouble and decided he would probably lose his job, so he decided to visit a girl in Virginia with whom he had been corresponding while he was in prison. Appellant testified that he planned to go to Georgia and fly from Atlanta to Virginia. Appellant was arrested before he got to the airport. When asked what he planned to do with the pistol, he stated he planned to take it with him to Virginia, if he could "clarify it through customs and inform them I had it in my bag. . . ."
On this appeal it is argued that (1) there was insufficient circumstantial evidence upon which the jury could base its verdict; and (2) the Uniform Mandatory Disposition of Detainers Act, § 15-9-80 et seq., Code of Alabama 1975, requires that the charges be dismissed due to the State's failure to comply with the provisions of the act.
 I
As in the case of Casey v. State, 401 So.2d 330, 331
(Ala.Cr.App. 1981), there is "no direct evidence" showing that appellant broke into and entered the vehicle in question. InCasey, at 331, we stated, "Circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused."
Appellant cites Weathers v. State, 439 So.2d 1311
(Ala.Cr.App. 1983); Cox v. State, 373 So.2d 342 (Ala.Cr.App. 1979); and Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), for the proposition that "a defendant should not be convicted on circumstantial evidence unless [the] evidence excludes beyond a reasonable doubt and to a moral certainty every reasonable hypothesis but that of the guilt of the defendant." Appellant argues that his explanation of how he came to be in possession of the pistol was just as reasonable as Gilliland's version of the facts, and should not have been excluded by the jury.
As we stated in Cumbo, at 874: "The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." This is not a case where the defendant was convicted on "mere suspicion or out of fear that he might have committed the crime." Weathers v. State, supra.
In the case sub judice, there was sufficient evidence before the jury from which they might have excluded every reasonable hypothesis except that of guilt beyond a reasonable doubt. There was testimony that Gilliland's truck had been damaged in an area of accessibility; the truck was customarily locked in Gilliland's absence; the handgun last seen under the truck seat was missing; the missing handgun was next seen in appellant's possession and ultimately was taken from appellant by law enforcement personnel in another jurisdiction. Based on this evidence the jury could reasonably conclude, and apparently did so conclude, that there was a nonconsensual breaking and entering of Gilliland's truck by appellant, for the purpose of taking the handgun, i.e., committing a theft, in violation of §13A-8-11 (b). Obviously the jury disbelieved appellant's version of the facts. "Whether circumstantial evidence tending to connect the defendant with the *Page 661 
crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant's guilt is a question for the jury and not the court." Cumbo, at 875. We therefore find appellant's argument to be without substance.
 II
While appellant was incarcerated in a Tennessee prison facility he wrote a letter to the prosecuting attorney of Etowah County, stating, "I wish to formally protest and contest the existing charges against me." Appellant stated that he was willing to negotiate the matter but had "no desire" to return to Alabama under any circumstances in the near future. . . ." He was willing to compensate the victim "giving no reflection to my innocence or guilt."
This letter was dated "1-9-84"; however, it was marked "filed" with the circuit clerk's office on July 13, 1984. Appellant now contends that this letter was sent pursuant to the Uniform Mandatory Disposition of Detainers Act, § 15-9-80
through § 15-9-88, Code of Alabama 1975. Appellant argues that since he was not returned to Alabama within 180 days from the date on his letter, the Act requires that the charges against him be dismissed.
The method by which "a defendant incarcerated in one state may request to be transferred to another state to stand trial on charges for which the other state has placed a detainer on him," is set forth in § 15-9-81 (Art. III) of the said Act.Smith v. State, 409 So.2d 958 (Ala.Cr.App. 1981). In the case at bar, appellant failed to comply with the requirements of the Act. Among other things, the Act requires that "the request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner" stating certain facts (Art. III (a)); that the written notice be sent by the appropriate corrections official having custody of the defendant, by certified or registered mail, return receipt requested (Art. III (b)). These simple prerequisites were not followed in the case sub judice.
In McCallum v. State, 407 So.2d 865 (Ala.Cr.App. 1981), we stated:
 "When a prisoner chooses to bypass the simple procedure provided in art. III (b), and attempts to deal directly with officials in the receiving state, he must satisfy the additional requirements of the agreement which would normally be executed by officials in the sending state."
Strict compliance with the requirements of Art. III is necessary in order to trigger the state's obligations under the Act when the statutory procedure is bypassed. Whitley v. State,392 So.2d 1220 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1225
(Ala. 1981). Appellant's uncertified or unregistered letter seeking to negotiate his charges was insufficient to trigger the State's obligation under the Act. It is for situations such as this that the certified or registered mail requirement was enacted. See Whitley, at 1224, quoting State v. Grizzell,584 S.W.2d 678 (Tenn.Cr.App. 1979). We therefore hold that the state did not violate any portion of the Uniform Mandatory Disposition of Detainers Act, and appellant was properly tried for the charges set out in the indictment.
For the foregoing reasons the case is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.